No. 26-1962

# United States Court of Appeals
# For the Eighth Circuit

NETCHOICE, LLC,
Plaintiff-Appellee,

v.

TIM GRIFFIN, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF ARKANSAS, ET AL.
Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Arkansas
No. 5:25-CV-5140 (Hon. Timothy L. Brooks)

**Defendants-Appellants' Opening Brief**

TIM GRIFFIN
Arkansas Attorney General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL

101 West Capitol Avenue
LITTLE ROCK, AR 72201
(501) 682-2007
autumn.patterson@arkansasag.gov
joseph.nelson@arkansasag.gov
erica.crouse@arkansasag.gov

AUTUMN HAMIT PATTERSON
Solicitor General

JOSEPH NELSON
Senior Assistant Solicitor General

M. ERICA CROUSE
Assistant Solicitor General

*Counsel for Defendants-Appellants*

## Summary of the Case and Statement Regarding Oral Argument

Arkansas enacted Act 900 to protect children from the dangers they face on social media—both from the platforms themselves, and the predators lurking on them. Act 900 therefore requires platforms to set children's accounts to the highest privacy-and-safety settings available and to pause notifications to children at night. It also prohibits platforms from engaging in any conduct for the purpose of addicting children to social media. NetChoice sued to block enforcement of Act 900, and the district court granted a preliminary injunction. The district court concluded that Act 900's provisions likely facially violate the First Amendment and are void for vagueness. This appeal thus involves numerous questions, including whether NetChoice carried its daunting burden to prove Act 900 facially unconstitutional when it didn't develop a record reflecting every potential application; whether the district court erred in nevertheless deeming Act 900 facially unconstitutional by simply assuming all applications of certain Act 900 provisions implicate the First Amendment and flunk intermediate scrutiny; and whether NetChoice has standing to challenge Act 900 on behalf of the very children Act 900 protects.

Given the important issues involved, and given that this Court has consolidated this appeal with two other appeals involving numerous issues, Defendants-Appellants respectfully request 30 minutes for oral argument.

## Table of Contents


Summary of the Case and Statement Regarding Oral Argument ............................i

Table of Contents...............................................................................ii

Table of Authorities ..........................................................................v

Jurisdictional Statement ..................................................................... 1

Statement of Issues ........................................................................... 1

Statement of Case ............................................................................3

A. Social media poses unprecedented dangers to children ...........................3

B. Arkansas enacts Act 900 to protect children from social-media exploitation...........................................................................7

C. NetChoice sues, and the district courts blocks Act 900's enforcement .............................................................................9

Summary of Argument ....................................................................... 11

Argument.......................................................................................... 14

I. Standard of Review ....................................................................... 14

II. NetChoice Cannot Litigate on Behalf of Arkansans .................................. 15

III. NetChoice Hasn't Carried Its Daunting Burden to Show Likely Success on Its Facial Challenge............................................. 18

A. The Notifications Provision doesn't violate the First Amendment....................................................................... 19

*1. NetChoice failed to develop the record to determine which applications implicate protected activity—and many applications don't* .......... 20

*2. To the extent the Notifications Provision regulates speech, it's a constitutional time, place, and manner restriction* .......... 22

*3. The district court's tailoring analysis is flawed and flouts the party-presentation principle* .......... 25

B. The Privacy-and-Safety Provision doesn't violate the First Amendment .......... 34

*1. NetChoice failed to develop the record to determine which applications implicate protected activity, and the district court's unsubstantiated assumption that every application does requires reversal* .......... 35

*2. To the extent the Privacy-and-Safety Provision regulates speech, it's content-neutral, and withstands intermediate scrutiny* .......... 38

C. The Addictive-Practices Provision isn't impermissibly vague .......... 48

*1. The Addictive-Practices Provision isn't standardless* .......... 48

*2. The Addictive-Practices Provision's specific mens rea requirement controls over the generic strict-liability provision* .......... 50

*3. The Addictive-Practices Provision applies only to social-media addictions and isn't unconstitutional regardless* .......... 54

D. The Audit Provision isn't unconstitutionally vague .......... 57

IV. NetChoice Hasn't Carried Its Burden on the Remaining Preliminary-Injunction Factors .......... 59

V. Any Preliminary Injunction Must Be Tailored ........................................... 61

Conclusion.................................................................................................62

Certificate of Compliance .........................................................................64

Certificate of Service.................................................................................64

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A. J. T. ex rel. A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025) ........ 29

*Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) ........ 2, 49-51, 53

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ........ 23, 30

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........ 46

*Bowker v. State*, 214 S.W.3d 243 (Ark. 2005) ........ 47, 54, 57

*Brandt v. Griffin*, 147 F.4th 867 (8th Cir. 2025) (en banc) ........ 24, 27, 30, 47, 60

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ........ 30-32

*Bush v. State*, 2 S.W.3d 761 (Ark. 1999) ........ 56

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ........ 61

*Calzone v. Summers*, 942 F.3d 415 (8th Cir. 2019) ........ 2, 55, 58

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022) ........ 23

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) ........ 22, 24, 31, 39, 42

*Computer & Commc'ns Indus. v. Paxton*, 177 F.4th 665 (5th Cir. 2026) ........ 23, 28

*Computer & Commc'ns Indus. v. Paxton*,
2026 WL 1945418 (U.S. July 6, 2026) .......................................................... 23, 28

*Craig v. Boren*,
429 U.S. 190 (1976) ............................................................................ 16, 17

*Doe v. Burlew*,
165 F.4th 525 (6th Cir. 2026) ........................................................................ 21

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ........................................................................................ 46

*Eggers v. Evnen*,
48 F.4th 561 (8th Cir. 2022) ............................................................... 15, 60

*Fayetteville Pub. Libr. v. Crawford County*,
2026 WL 2197765 (8th Cir. July 30, 2026) ......................... 1, 12, 19-21, 26, 35-36

*FDA v. All. or Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................... 10, 17, 37

*First Arkansas Bail Bonds v. Arkansas*,
284 S.W.3d 525 (Ark. 2008) .................................................... 25, 40, 53

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ................................................ 22-23, 27-29, 42-43

*Gebresadik v. Gonzales*,
491 F.3d 846 (8th Cir. 2007) ........................................................................ 45

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ....................................................................... 22

*Gold Cross Ambulance & Transfer v. City of Kansas City*,
705 F.2d 1005 (8th Cir. 1983) ...................................................................... 16

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981) ........................................................................................ 22

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ................................................................................... 49, 50

*Iowa Safe Schs. v. Reynolds*,
172 F.4th 589 (8th Cir. 2026) .......... 48

*Jackson v. Norris*,
426 S.W.3d 906 (Ark. 2013) .......... 61, 62

*Keep Our Dollars in Indep. Cnty. v. Mitchell*,
518 S.W.3d 64 (Ark. 2017) .......... 52

*King v. Burwell*,
576 U.S. 473 (2015) .......... 56

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .......... 1, 15, 17

*Langford v. City of St. Louis*,
3 F.4th 1054 (8th Cir. 2021) .......... 49, 55, 58

*Margolin v. Nat'l Ass'n of Immigr. Judges*,
146 S. Ct. 1285 (2026) .......... 1, 26, 45

*Martin v. City of Struthers*,
319 U.S. 141 (1943) .......... 24

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 14, 59, 61

*McDonald v. Bowen*,
468 S.W.2d 765 (Ark. 1971) .......... 57

*McKinney v. Robbins*,
892 S.W.2d 502 (Ark. 1995) .......... 56, 57

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) (per curiam) .......... 29, 60

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 1, 3, 7, 11, 16, 18-21, 36-38

*Nat'l Cable & Tele. Ass'n, Inc. v. Gulf Power Co.*,
534 U.S. 327 (2002) .......... 51

*NetChoice v. Griffin*,
812 F. Supp. 3d 905 (W.D. Ark. 2025) .......... 38

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) .......... 18, 21, 27, 37, 39, 41, 44, 61

*NetChoice, LLC v. Bonta*,
170 F.4th 744 (9th Cir. 2026) .......... 19-20, 35-36

*NetChoice, LLC v. Yost*,
180 F.4th 268 (6th Cir. 2026) .......... 1, 3-5, 11, 13, 16-18, 30, 32-33

*New York v. Ferber*,
458 U.S. 747 (1982) .......... 24

*Penn. Fam. Inst., Inc. v. Black*,
489 F.3d 156 (3d Cir. 2007) .......... 37

*Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
280 F.3d 278 (3d Cir. 2002) .......... 17

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015) .......... 14, 60

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 51, 52

*Rogers v. Rogers*,
97 S.W.3d 429 (Ark. App. 2003) .......... 46

*Rogers v. Scurr*,
676 F.2d 1211 (8th Cir. 1982) .......... 61

*Roth v. U.S. Dep't of Just.*,
642 F.3d 1161 (D.C. Cir. 2011) .......... 45

*Searcy Farm Supply, LLC v. Merchants & Planters Bank*,
256 S.W.3d 496 (Ark. 2007) .......... 51

*State v. Colvin*,
427 S.W.3d 635 (Ark. 2013) .......... 52

*Swanson v. Hilgers*,
151 F.4th 992 (8th Cir. 2025) .......... 15

*Swanson v. Hilgers*,
146 S. Ct. 1602 (2026) .......... 15

*Thigulla v. Jaddou*,
94 F.4th 770 (8th Cir. 2024) .......... 56

*Thornbrough v. Gage*,
350 S.W.2d 306 (Ark. 1961) .......... 53

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 1, 12, 23, 28-30, 32, 39, 42

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 60

*United States v. Beeler*,
168 F.4th 1111 (8th Cir. 2026) .......... 55, 59

*United States v. Behrens*,
713 F.3d 926 (8th Cir. 2013) .......... 56

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 19, 47, 53, 54, 57, 59

*United States v. O'Hara*,
143 F. Supp. 2d 1039 (E.D. Wis. 2001) .......... 50, 51

*United States v. Soza*,
874 F.3d 884 (5th Cir. 2017) .......... 49, 50

*United States v. Williams*,
553 U.S. 285 (2008) .......... 48

*Van Bergen v. State of Minn.*,
59 F.3d 1541 (8th Cir. 1995) .......... 22, 25

*W. Virginia v. B. P. J.*,
146 S. Ct. 2356 (2026) .......... 42, 43

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 42, 49

*Williams-Yulee v. Florida Bar*,
575 U.S. 433 (2015) .......... 28

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 15

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 30

**Rules & Statutes**

28 U.S.C. § 1292 .......... 1

28 U.S.C. § 1331 .......... 1

Ark. Code Ann. § 1-2-205 .......... 61, 62

Ark. Code Ann. § 4-88-103 .......... 54

Ark. Code Ann. § 4-88-1401 .......... 8, 26

Ark. Code Ann. § 4-88-1402 .......... *passim*

Ark. Code Ann. § 4-88-1403 .......... 50-52

Ark. Code Ann. § 4-88-1502 .......... 52, 53

Cal. Civ. Code Ann. § 1746.1 .......... 31

**Other Authorities**

Ashley Knight, *Baldwin Co Mom Warns of Predators on Pinterest After Catching Daughter Talking to Stranger*
https://mynbc15.com/news/local/mother-warns-of-predators-on-pinterest-after-catching-daughter-talking-with-a-stranger .......... 41

*Best Practices-Social Media*, Harvard University
https://privsec.harvard.edu/best-practices-social-media .......... 36

Dictionary.Cambridge.org
https://dictionary.cambridge.org/us/dictionary/english/default .................... 46

*FBI and Partners Issue National Public Safety Alert on Financial Sextortion Schemes*, FBI Nat'l Press Off. (Dec. 19, 2022)
https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes ............................. 6

*How Discord Is Building Safer Experiences for Teens*, DISCORD (Feb. 9, 2026)
https://perma.cc/BKD8-TQE8 .................................................................... 46

*How notifications work on Instagram*, INSTAGRAM
https://perma.cc/4CVW-7PUN?type=image ........................................... 26, 29

*How We Can Help You: Sextortion,* FBI (2022)
https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/sextortion .................................................... 6

*Instagram Notifications AI system*, META (July 1, 2026)
https://perma.cc/MY98-UXPJ ..................................................................... 21

Jesselyn Cook, *Men on Pinterest are creating sex-themed image boards of little girls. The platform makes it easy.*, NBC NEWS (Mar. 9, 2023)
https://www.nbcnews.com/tech/internet/pinterest-algorithm-young-girls-videos-grown-men-investigation-rcna72469 .................................. 41

*Lake Forest Man Faces Sex Charge After Connecting with Teen on Nextdoor App, Court Papers State*, KIRO 7 NEWS (June 26, 2020)
https://www.kiro7.com/news/local/lake-forest-man-faces-sex-charge-after-connecting-with-teen-nextdoor-app-court-papers-state/RGGW65HOHRBUPI6P4FFBGJAVZI/ ............................................. 41

Marsha Blackburn and Richard Blumenthal, *Letter to Bill Ready* (Mar. 14, 2023),
https://www.blackburn.senate.gov/services/files/1C2A5112-CCC9-4EA9-B431-54FE8E7383E8 .................................................. 41

Merriam-Webster Collegiate Dictionary (11th ed. 2003) .......................................49

Merriam-Webster.com
https://www.merriam-webster.com/dictionary/default ..................................46

*The Teen Experience on Snapchat*, SNAPCHAT
https://perma.cc/8BKK-LANP .....................................................................46

U.S. Surgeon General's Advisory, Social Media and Youth Mental Health (2023)
https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf .........................................................................3-5

## Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. § 1331 and issued a preliminary injunction on April 20, 2026. App. 921; R. Doc. 69. Arkansas timely appealed on May 6, 2026. R. Doc. 71. This Court has jurisdiction under 28 U.S.C. § 1292(a).

## Statement of Issues

**1.** Whether NetChoice has third-party standing to challenge Act 900 on Arkansans' behalf.

Apposite Authority: *NetChoice, LLC v. Yost*, 180 F.4th 268 (6th Cir. 2026); *Kowalski v. Tesmer*, 543 U.S. 125 (2004).

**2.** Whether NetChoice carried its daunting burden for facial challenges.

Apposite Authority: *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *Fayetteville Pub. Libr. v. Crawford County*, No. 25-1146, 2026 WL 2197765 (8th Cir. July 30, 2026).

**3.** Whether Act 900's Default Provisions withstand intermediate scrutiny to the extent they burden speech, and whether the district court violated the party-presentation rule in concluding otherwise.

Apposite Authority: *TikTok Inc. v. Garland*, 604 U.S. 56 (2025); *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285 (2026).

**4.** Whether Act 900's Addictive-Practices and Audit Provisions are unconstitutionally vague.

Apposite Authority: *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008); *Calzone v. Summers*, 942 F.3d 415 (8th Cir. 2019).

## Statement of Case

### A. Social media poses unprecedented dangers to children.

As the Supreme Court recently noted, social media presents "unprecedented dangers." *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024). Meta's own AI chatbot concurs, explaining that social media "definitely" can be "harmful or addictive ... for a lot of folks." App. 816; R. Doc. 66-2, at 9. Those dangers are particularly acute for minors, among whom social-media use is "nearly universal." U.S. Surgeon General's Advisory, Social Media and Youth Mental Health 4 (2023) ("Surgeon Gen. Report").[1] Indeed, 95% of children between the ages of 13-17 use social media—and over a third say "they use [it] 'almost constantly.'" *Id.* The *average* eighth and tenth grader spends nearly four hours per day on social media. *Id.* at 10. What's more, a quarter spend over five hours on social media daily, and one in seven eclipse *seven* hours. *Id.* Social-media use is also prevalent among even younger children, with nearly 40% of children from ages 8-12 using it. *Id.* at 4.

"[M]inors' attachment to social media is no accident," *NetChoice, LLC v. Yost*, 180 F.4th 268, 277 (6th Cir. 2026). To the contrary, social-media platforms are designed to maximize the time users spend online, using various mechanisms to

[1] https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

accomplish that goal. *See, e.g.*, App. 925; R. Doc. 69, at 5 (district court recognizing same). For instance, Meta's chatbot likens algorithms that determine what content is pushed to each user to "digital puppeteer[s] trying to keep [users] hooked." App. 802; R. Doc. 66-1, at 6. And children are "especially susceptible" to such features. App. 925; R. Doc. 69, at 5. After all, "[y]oung eyes on screens are highly profitable in terms of advertising revenue." *Yost*, 180 F.4th at 277. So platforms have every incentive to keep minors scrolling for as much of the day (and night) as possible.

But while keeping children online is good for platforms' bottom lines, it's deeply harmful to children themselves. Indeed, social media poses "profound risk[s] of harm to the mental health and well-being of children and adolescents." *Surgeon Gen. Report* 4. *See* App. 803, 807; R. Doc. 66-1, at 7, 11 (Meta chatbot noting same). For instance, among children seventeen and under, social-media use for more than one hour per day is "associated with lower psychological well-being, including less curiosity, lower self-control, more distractibility, more difficulty making friends, less emotional stability, being more difficult to care for, and inability to finish tasks." App. 586-87, R. Doc. 57-12, at 3-4; *see* App. 926; R. Doc. 69, at 6. And adolescents who spend more than three hours on social media per day face double the risk of mental-health issues like depression and anxiety. *Surgeon Gen. Report* 6.

What's more, there's a "strong association between [social-media] use and sleep disturbance." App. 617; R. Doc. 57-14, at 3. *See* App. 800; R. Doc. 66-1, at 4 (Meta chatbot noting same). And "[t]he negative effects of social media use on sleep quality and duration are especially concerning for minors because sufficient sleep 'is crucial to child health to support neurological development, bone growth, and [a] regulated endocrine system.'" App. 926; R. Doc. 69, at 6 (citing App. 523; R. Doc. 57-10, at 14). A "key mechanism" disrupting children's sleep is push notifications, which platforms send to children's devices throughout the night to entice them online. App. 523; R. Doc. 57-10, at 14-15. The poor sleep caused by social media, in turn, can lead to depression, and "suicidal thoughts and behaviors." *Surgeon Gen. Report* 10.

Moreover, "[m]inors on social media face risks not just from the platforms themselves, but also from other people online." App. 926; R. Doc. 69, at 6. Indeed, "social media imperils children by exposing them to sexual and financial predators." *Yost*, 180 F.4th at 277. Over 300 million children per year are victims of "technology-facilitated sexual exploitation and abuse." App. 665; R. Doc. 57-18, at 2. And social media is often "a component or primary mechanism of contact or exploitation," as predators "can scour [children's] social media for data that signals vulnerabilities to

exploitation, and can create false online accounts to shield their true identity and create a false persona." App. 436, 438; R. Doc. 57-8, at 25, 27.

Indeed, a Meta researcher has estimated "that there may be upward of a half a million cases of sexual exploitation of minors every day on social media platforms." App. 410; R. Doc. 57-7, at 4. For example, sex traffickers use social media to "recruit[ ]" "at-risk young people." App. 437; R. Doc. 57-8, at 26. Other predators use it to solicit pornographic images from adolescents or to arrange in-person meetings that lead to sexual abuse. App. 438-39; R. Doc. 57-8, at 26-27. Predators also target children in "sextortion" schemes, convincing them to send explicit images of themselves, and then "'threaten[ing] to release the compromising material unless the victim sends money' or more images." App. 436; R. Doc. 57-8, at 25 (quoting *How We Can Help You: Sextortion,* FBI (2022)).[2] In recent years, the FBI has noted a "horrific increase in reports of financial sextortion schemes targeting minor boys" in particular. *FBI and Partners Issue National Public Safety Alert on Financial Sextortion Schemes*, FBI Nat'l Press Off. (Dec. 19, 2022).[3]

---

[2] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/sextortion.

[3] https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes.

In sum, social media can be perilous for children. Recognizing the adverse impacts social media frequently has on their lives, "[t]eens want help controlling the time they spend on [social media]." App. 335; R. Doc. 57-1, at 54. But as Meta's own internal documents explain, children often "lack the willpower to control the time [they] spen[d] [on social media] themselves." *Id.* That's unsurprising considering platforms are often designed to keep users scrolling for as long as possible—and children are especially susceptible to the features platforms employ to accomplish this revenue-generating goal. App. 925; R. Doc. 69, at 5. Likewise, as Meta's documents explain, parents "can't understand and don't know how to help" manage their children's social-media use, including because many "parents came of age in a time before smartphones and social media." App. 332; R. Doc. 57-1, at 51.

### B. Arkansas enacts Act 900 to protect children from social-media exploitation.

Recognizing the "unprecedented dangers" children and adults alike face on social media, *Moody*, 603 U.S. at 716, Arkansas enacted several laws to protect users from harm, as reflected in this consolidated appeal. Among them is Act 900 of 2025. Act 900 requires platforms[4] to, "by default," pause notifications to Arkansans under

[4] Act 900 defines "social media platform" as "a business entity or organization that operates an online platform, application, or service" that has various characteristics, including that it's "designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication," "[p]rovides mechanisms for a user

the age of 16, Ark. Code Ann. § 4-88-1401(9), between 10:00 p.m. and 6:00 a.m, though children's "parents or guardians" may modify this setting, *id.* § 4-88-1402(d)(2)(A) ("Notifications Provision"). Likewise, platforms must "[e]nsure that, by default," children's accounts are set to the "most protective level of control for privacy and safety" that the platform offers. *Id.* § 4-88-1402(d)(2)(B) ("Privacy-and-Safety Provision," and, together with the Notifications Provision, "Default Provisions"). Platforms must also provide parents with an "online dashboard" to help them "view and understand" their children's social media usage and habits. *Id.* § 4-88-1402(d)(4)(A) ("Dashboard Provision").

Meanwhile, Act 900 requires platforms to "ensure that" they don't "engage in practices to evoke any addiction or compulsive behaviors in" Arkansas children. *Id.* § 4-88-1402(d)(1) ("Addictive-Practices Provision"). Finally, and relatedly, platforms must conduct a "quarterly audit to ensure that the social-media platform's

---

to create an online profile comprised of personally identifiable information," "[e]mploys features that allow a user to connect, follow, or establish a relationship with other users," and "[g]enerates revenue primarily through user engagement, including without limitation through advertising, user data monetization, or premium content." *Id.* § 4-88-1401(11)(A). The definition excludes "an email service provider, a not-for-profit organization, a public or private school, business-to-business software, a common carrier, or a broadband internet service." *Id.* § 4-88-1401(11)(B).

software, application, or other products are not causing minors to engage in compulsory or addiction-driven behavior." *Id.* § 4-88-1402(d)(3) ("Audit Provision").[5]

Act 900's violators are subject to both civil and criminal liability. Criminal violations must be "knowing[] and willful[]." *Id.* §§ 4-88-103, 4-88-104. Arkansas's Attorney General enforces Act 900 civilly, *id.* § 4-88-1403(b)(2)(A), while Arkansas's prosecutors enforce it criminally, *id.* § 4-88-1403(b)(1).

### C. NetChoice sues, and the district court blocks Act 900's enforcement.

In June 2025, NetChoice sued Arkansas's Attorney General and prosecutors, seeking to block enforcement of Act 900 before it went into effect.[6] NetChoice is a trade association whose members include Meta (which owns and operates Facebook and Instagram), Discord, Snap, X, Pinterest, and Google (which owns YouTube). App. 28; R. Doc. 2, at 5. NetChoice brought both facial and as-applied challenges, arguing that certain Act 900 provisions violate the First Amendment and are unconstitutionally vague, and sought a preliminary injunction. R. Doc. 52, at 12, 35.

---

[5] As explained, Act 900 also amended provisions originally from Act 689 at issue in consolidated case No. 25-1889.

[6] In the same lawsuit, NetChoice also challenged Act 901, which the district court separately preliminarily enjoined Defendants from enforcing. That's on appeal in consolidated case No. 26-1096.

In April 2026, the district court granted NetChoice's preliminary-injunction motion, concluding that NetChoice was likely to succeed on its facial challenges only. App. 921; R. Doc. 69. In doing so, it assumed—without a developed record—that *all* the Default Provisions' applications restricted protected speech. *See* App. 936, 938; R. Doc. 69, at 16, 18. And the court concluded that the Notifications Provision was inadequately tailored and failed intermediate scrutiny because it: (1) allows parents to permit nighttime notifications; and (2) technically prohibits platforms from sending notifications to children who don't have accounts (in addition to accountholders)—notwithstanding that NetChoice never made that argument. *See* App. 936; R. Doc. 69, at 16. Likewise, the district court concluded the Privacy-and-Safety Provision was insufficiently tailored because (1) it extends to Nextdoor and Pinterest, which the court believed are "unlikely to be the site of sexual exploitation," and (2) the district court believed the provision allowed children to change the privacy-and-safety setting. App. 939; R. Doc. 69, at 19.

Meanwhile, the district court concluded the Addictive-Practices Provision is unconstitutionally vague because civil violations of Act 900's provisions are generally strict-liability offenses. It didn't address Defendants' argument that the Addictive-Practices Provision imposes liability only if platforms engage in practices "*to* evoke" addiction, which denotes a *mens rea* of purpose. *See* App. 934; R. Doc.

69, at 14. And the court summarily concluded that the Audit Provision is unconstitutionally vague too. App. 935; R. Doc. 69, at 15.[7]

So the district court preliminarily enjoined Act 900's enforcement against NetChoice's members. Defendants appealed.

## Summary of Argument

The district court's order is fundamentally flawed on many levels. For starters, the court permitted NetChoice to litigate on behalf of its members' users—notwithstanding that NetChoice challenges laws protecting those children from exploitation *by NetChoice's own members*. The respective interests of NetChoice and children are therefore "diametrically opposed," and NetChoice lacks third-party standing to assert their rights. *Yost*, 180 F.4th at 305 (Batchelder, J., concurring).

Beyond this threshold issue, NetChoice didn't carry the daunting burden that applies to its facial challenges. It failed to develop a record of all Act 900's potential applications. The district court nevertheless excused NetChoice's failure—ignoring the Supreme Court's admonition that "neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Moody*, 603 U.S. at 744. And it purported to perform the facial analysis anyway, relying on its

[7] The district court also held the Dashboard Provision likely unconstitutional. Defendants don't specifically challenge that determination here.

unsupported (and erroneous) assumption that *every* potential application of Act 900 restricts speech. In reality, the district court "bypassed the required inquiry entirely," rendering its "overbreadth analysis … patently deficient." *Fayetteville Pub. Libr. v. Crawford County*, No. 25-1146, 2026 WL 2197765, at *6 (8th Cir. July 30, 2026) (reversing same district court for same error). These errors compel reversal even considered alone.

Moreover, the limited analysis of Act 900's potential applications that the district court performed was flawed. To be sure, the district court correctly recognized that the Default Provisions trigger intermediate scrutiny (at most), and that Arkansas's interest in protecting children from social-media-occasioned harms is extraordinarily important. But it then went off course, concluding that the Default Provisions' potential applications flunk intermediate scrutiny because the provisions are (supposedly) inadequately tailored. In doing so, the court ignored the substantial "latitude" intermediate scrutiny affords States. *TikTok Inc. v. Garland*, 604 U.S. 56, 77-78 (2025).

For instance, impermissibly substituting its own judgment for Arkansas's, the district court concluded that the Notifications Provision is underinclusive because it allows parents to determine whether their child's individual needs or circumstances warrant an exception from the general no-nighttime-notifications rule. And the

district court also overlooked that, by simply "involv[ing]" parents in their child's social-media activity, the Notifications Provision "will inherently mitigate" social media's dangers. *Yost*, 180 F.4th at 291. Likewise, the district court deemed the Notifications Provision overinclusive based on its purported application to children *without* social-media accounts—notwithstanding that notifications are intrinsically associated with users' accounts. Indeed, it's unclear whether platforms even *can* send notifications to non-accountholders.

Meanwhile, the district court concluded the Privacy-and-Safety Provision is overinclusive based on its mistaken belief that children don't face exploitation risks on Nextdoor and Pinterest—yet again disregarding the discretion intermediate scrutiny affords. It deemed the Privacy-and-Safety Provision underinclusive too by interpreting it to permit children to simply select a less-safe setting—ignoring text, context, and commonsense in the process. Topping off these tailoring errors, the district court flouted the party-presentation rule and relied on arguments that NetChoice either never raised at all or only raised in passing at oral argument.

The district court's consideration of the Addictive-Practices and Audit Provisions—and its conclusion that they are unconstitutionally vague—are similarly flawed. For starters, the court wrongly concluded that the Addictive-Practices Provision creates a strict-liability offense. And it only reached that conclusion by

ignoring Defendants' argument that, by prohibiting platforms from engaging in practices "to evoke" addiction, the provision imposes liability only when platforms act with the specific goal of causing addiction. Ignoring statutory context, the court also concluded the Addictive-Practices and Audit Provisions apply to addictions beyond social-media addictions (*e.g.*, alcoholism). And the court then wrongly concluded that this added breadth made the provisions impermissibly vague—notwithstanding this Court's repeated explanation that breadth itself doesn't render statutes unconstitutional.

This Court should reverse.

## Argument

### I. Standard of Review

A preliminary injunction is "an extraordinary and drastic remedy" that "should not be granted" unless plaintiffs have, "by a clear showing," "carrie[d] the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Though a preliminary injunction is generally reviewed for abuse of discretion, "[w]hen purely legal questions are presented," this Court gives "no special deference to the district court" and reviews "legal conclusions de novo." *Powell v. Noble*, 798 F.3d 690, 697 & n.1 (8th Cir. 2015). To obtain a preliminary injunction, plaintiffs must establish that they (1) are "likely to succeed on the merits," (2) will "likely suffer irreparable

harm absent preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008). When the government is the nonmoving party, "[t]he balance-of-harms and public-interest factors merge." *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022) (quotation omitted).

## II. NetChoice Cannot Litigate on Behalf of Arkansans.

As a threshold matter, NetChoice lacks standing to litigate on behalf of its members' users. Parties generally "must assert [their] own legal rights and interests," and "cannot rest [their] claim[s] to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation omitted). While the Supreme Court has recognized third-party standing in some circumstances, it has narrowly "limited this exception." *Id.* at 130. To establish third-party standing, a party must show that (1) it "has a close relationship with the person who possesses the right," and (2) there's "a hindrance to the possessor's ability to protect his own interests." *Id.* (quotation omitted). NetChoice fails on both prongs here—just as it does in the other consolidated cases.

First, NetChoice lacks a sufficiently "close" relationship with Arkansas children who use social media. *Id.* To satisfy this prong, NetChoice must show that its interests are "align[ed]" with Arkansas children's interests. *Swanson v. Hilgers*, 151

F.4th 992, 997 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 1602 (2026). But far from being sufficiently aligned, NetChoice's and its members' "interests" are in "substantial conflict" with those of Arkansas children. *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1016 (8th Cir. 1983). That's because "NetChoice and its Members are interested in exploiting minors' engagement with Members' sites regardless of what outcome is in [minors'] best interests." *See Yost*, 180 F.4th at 282 (rejecting third-party standing). After all, while social media use "imperils children" (and users in general) in various ways, "[y]oung eyes on screens are highly profitable" to platforms. *Id.* at 277. And to safeguard its members' bottom lines, NetChoice challenges legislation that protects children from social media's "unprecedented dangers." *Moody*, 603 U.S. at 716. So NetChoice's interests are "diametrically opposed" to children's, and it lacks the necessary relationship for third-party standing. *Yost*, 180 F.4th at 305 (Batchelder, J., concurring).

Notwithstanding this "substantial conflict" between the interests of NetChoice, its members, and Arkansas children, *Gold Cross Ambulance*, 705 F.2d at 1016, the district court concluded that NetChoice could litigate minors' rights. App. 931; R. Doc. 69, at 11. It relied on *Craig v. Boren*, 429 U.S. 190 (1976), in which a beer vendor had third-party standing to challenge liquor laws on customers' behalf. But *Craig* and cases like it are inapposite, because "the relationship between

NetChoice and [children] is not like typical vendor-customer relationships." *Yost*, 180 F.4th at 285. NetChoice's lawsuits "directly pit [its] self-interest against [children's] wellbeing." *Id.* Indeed, Meta's own documents acknowledge that children "want help controlling" their social-media use, App. 335; R. Doc. 57-1, at 54—yet NetChoice challenges laws that provide that much-needed help. So *Craig* is inapposite.

Moreover, even if NetChoice's *members* had a sufficiently close relationship with Arkansas children, NetChoice *itself* doesn't have any such relationship. NetChoice seeks to litigate the interests of its members' users by combining associational and third-party standing. It cannot do so. *See Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 294 (3d Cir. 2002) (Nygaard, J., dissenting). Associational standing is already constitutionally dubious. *See FDA v. All. or Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring). This Court shouldn't extend it by recognizing a "hybrid-type of third-party derivative standing." *Green Spring*, 280 F.3d at 294 (Nygaard, J., dissenting).

Regardless, NetChoice fails on prong two of the third-party standing test, because it hasn't established any "hindrance" to social media users' ability to "protect [their] own interest[s]. *Kowalski*, 543 U.S. at 130. And children's own challenges to

laws like Act 900 demonstrates there is none. *See Yost*, 180 F.4th at 309 (Batchelder, J., concurring).

NetChoice therefore lacks third-party standing to litigate on behalf of Arkansans.

## III. NetChoice Hasn't Carried Its Daunting Burden to Show Likely Success on Its Facial Challenge.

NetChoice has once again brought a facial challenge. "And that decision comes at a cost." *Moody*, 603 U.S. at 723. Facial challenges in this online context entail "a daunting, if not impossible, task." *Id.* at 745 (Barrett, J., concurring). They require courts to "explore the laws' full range of applications" and consider whether each application is constitutional. *Id.* at 726 (majority). And in doing so, courts must "carefully parse not only what entities are regulated, but how the regulated activities *actually function* before deciding if the activity in question constitutes expression and therefore comes within the First Amendment's ambit" at all. *Id.* at 749 (Jackson, J., concurring).

The "online world is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection." *Id.* at 725 (majority). So this analysis requires consideration of "a massive amount of information about the internet." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1020 (9th Cir. 2025) ("*Bonta I*"). And plaintiffs bear the "burden to establish

[t]he factual record so that the [court] [can] properly consider [] every conceivable application" of the law. *NetChoice, LLC v. Bonta,* 170 F.4th 744, 758 (9th Cir. 2026) ("*Bonta II*"). Without such a record, courts "cannot determine [the law's] full set of applications," and the First Amendment implications (or lack thereof) of each. *Fayetteville Pub. Libr.*, 2026 WL 2197765, at *7 (quotation omitted).

Meanwhile, even if plaintiffs develop the necessary record, they must then show that, across all potential applications, "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724. Without such "a lopsided ratio," the facial challenge fails. *United States v. Hansen*, 599 U.S. 762, 770 (2023).

NetChoice came nowhere close to carrying its daunting burden here.

### A. The Notifications Provision doesn't violate the First Amendment.

NetChoice's facial challenge to the Notifications Provision fails. That provision requires platforms to pause notifications to children under 16 between 10 p.m. and 6 a.m.—though parents can change this setting. Ark. Code Ann. § 4-88-1402(d)(2)(A). The provision also includes a narrow carveout for "safety or privacy-related alerts." *Id.* The district court correctly recognized that Arkansas has "a significant interest in ensuring minors get enough sleep," and that the Notifications Provision "leaves open ample alternative channels for communication." App. 936;

R. Doc. 69, at 16. Nevertheless, the court concluded that the Notifications Provision was facially unconstitutional under the First Amendment. In doing so, it excused NetChoice's failure to develop the necessary record, and wrongfully concluded that the provision is inadequately tailored—violating the party-presentation rule in the process.

#### 1. *NetChoice failed to develop the record to determine which applications implicate protected activity—and many applications don't.*

To start, NetChoice made no attempt to develop the necessary record to fully assess "every conceivable application" of the Notifications Provision, *Bonta II*, 170 F.4th at 758, and "carefully parse" how every covered entity's notification system "*actually functions*." *Moody,* 603 U.S. at 749 (Jackson, J., concurring). That omission alone is fatal, *Fayetteville Pub. Libr.*, 2026 WL 2197765, at *6, especially considering that many notifications don't implicate the First Amendment.

After all, as NetChoice explained below, notifications often simply alert accountholders to other users' activity on the platform. *See* R. Doc. 52, at 22 (explaining that notifications inform "users about activity on the website, such as new content uploaded by other users," and "reactions and comments to content on the user's own account"). And insofar as those notifications simply "transmit" users' communications, they don't implicate any "editorial choice" by the platforms and therefore are not an "expressive product" at all. *Moody*, 603 U.S. at 726.

Indeed, notifications are often "automatically" sent to users without human input. *See, e.g.*, *Instagram Notifications AI system*, META (July 1, 2026)[8] (explaining that "[t]he AI system behind Instagram Notifications automatically determines which posts or activity you are notified about ... by predicting what you're most likely to be interested in"). Such notifications "communicate no message of [the platforms'] own." *Moody*, 603 U.S. at 782 (Alito, J., concurring). Instead, they "serve as 'passive receptacle[s] of third-party speech or as dumb pipes that merely emit what they are fed,'' and therefore "do[] not merit First Amendment protection." *Id.* (quotation omitted); *Bonta I*, 152 F.4th at 1014 (noting that "algorithm[s] that respond[] solely to how users act online ... probably [are] not expressive" (quotation omitted)).

Nevertheless, without any consideration of how each platform's notifications "*actually function*," *Moody,* 603 U.S. at 749 (Jackson, J., concurring), the district court apparently assumed that all notifications involve platforms' speech—giving NetChoice a pass for its woefully insufficient record along the way. This abject failure to "account for" the "online world[s']" extraordinary "variety" requires reversal, *Doe v. Burlew*, 165 F.4th 525, 536 (6th Cir. 2026), and renders the district court's analysis "patently deficient." *Fayetteville Pub. Libr.*, 2026 WL 2197765, at

[8] https://perma.cc/MY98-UXPJ.

*6. *See also GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024).

***2. To the extent the Notifications Provision regulates speech, it's a constitutional time, place, and manner restriction.***

Regardless, even if some of the Notifications Provision's applications regulate speech, the provision is a constitutional time, place, and manner restriction with respect to such applications. "The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Rather, "[i]t is well settled that government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified without reference to the content of the regulated speech." *Van Bergen v. State of Minn.*, 59 F.3d 1541, 1550 (8th Cir. 1995) (quotation omitted). Such restrictions are subject to only intermediate scrutiny. *Id.* Under that "forgiving" standard, *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *4 (11th Cir. Nov. 25, 2025) ("*CCIA*"), "a law will survive review if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests," *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) ("*FSC*") (quotation omitted).

Intermediate scrutiny thus affords States "latitude" "to design regulatory solutions to address content-neutral interests," *TikTok,* 604 U.S. at 77—and prevents courts from "second-guess[ing] [their] judgment," *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989). Indeed, a law's constitutionality "does not turn on whether [courts] agree with the government's conclusion that its chosen regulatory path is best or most appropriate." *TikTok*, 604 U.S. at 78 (quotation omitted). And even if an alternative approach were "equally or more effective, under intermediate scrutiny[,] a 'regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *FSC*, 606 U.S. at 497-98 (quotation omitted).

The district court correctly concluded that the Notifications Provision is a content-neutral, time, place, and manner restriction. App. 936; R. Doc. 69, at 16. After all, the provision is entirely "agnostic as to content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC,* 596 U.S. 61, 69 (2022).[9] And as explained in

[9] The district court's passing suggestion that the provision's exception for "safety or privacy-related alerts" is content-based is mistaken. App. 935; R. Doc. 69, at 15. As the Fifth Circuit recently explained of an analogous "emergency-services" exception in a similar statute, the exception is "not likely content-based" because it "focuses on why the service is needed, not what is being communicated." *Computer & Commc'ns Indus. v. Paxton*, 177 F.4th 665, 671 (5th Cir. 2026), *application to vacate stay denied* No. 25A1390, 2026 WL 1945418, at *1 (U.S. July 6, 2026). Like the exception there, the Notifications Provision's safety-or-privacy exception turns on the *purpose* of the alert rather than the *substance* of the underlying communication. *See*

Defendants' prior briefing in this consolidated appeal, the provision's specific application to social-media platforms permissibly differentiates by "*form* of expression," not by "*subject matter.*" *CCIA*, 2025 WL 3458571, at *4.

So insofar as it regulates speech, *but see supra* 20-22, the Notifications Provision is subject to only intermediate scrutiny, which it survives. The provision could survive strict scrutiny too, because "Arkansas has a 'compelling interest' in protecting the physical and psychological health of minors." *Brandt v. Griffin*, 147 F.4th 867, 890 (8th Cir. 2025) (en banc) (quoting *New York v. Ferber*, 458 U.S. 747, 756-57 (1982)). Adequate sleep is crucial to children's overall wellbeing, *see supra* 5, and nighttime notifications are a "key mechanism" disrupting children's sleep, App. 523; R. Doc. 57-10, at 14-15.

Thus, even the district court recognized that "Arkansas has a significant interest in ensuring minors get enough sleep," and, more generally, "an interest in 'the protection of [households] from annoyance, including intrusion upon the hours of rest.'" App. 936; R. Doc. 69 at 16 (quoting *Martin v. City of Struthers,* 319 U.S.

---

Ark. Code Ann. § 4-88-1402(d)(2)(A). And the exception serves the statute's goals: Without it, withholding safety-related alerts could cause children the very harms Act 900 seeks to prevent. Regardless, even if the exception made the provision content-based and it failed the applicable level of scrutiny, the exception is severable, as the district court correctly concluded. *See infra* 61-62.

141, 144 (1943)). And the court also acknowledged that, in advancing these interests, the Notifications Provision "leaves open ample alternative channels for communication." App. 936; R. Doc. 69 at 16. After all, the provision permits platforms to send notifications to children throughout the day—they just must take an eight-hour break after 10 p.m. *See* Ark. Code Ann. § 4-88-1402(d)(2)(A). In short, the Notifications Provision easily survives intermediate scrutiny. *See Van Bergen*, 59 F.3d at 1554 (concluding law forbidding nighttime robocalls was constitutional and noting States' "interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society" (quotation omitted)).

### *3. The district court's tailoring analysis is flawed and flouts the party-presentation principle.*

Despite acknowledging the important interests at stake, the district court nevertheless believed that the Notifications Provision is insufficiently tailored—and therefore flunks intermediate scrutiny—for two reasons.

*First*, flouting the party-presentation rule, the district court concluded the provision is overinclusive insofar as it limits platforms' ability to send nighttime notifications to not just accountholders, but non-accountholders as well. App. 936; R. Doc. 69, at 16. That's because the Notifications Provision applies to minor "Arkansas user[s]," Ark. Code Ann. § 4-88-1402(d)(2)(A), which include children that

"access" social-media platforms without an account, Ark. Code Ann. § 4-88-1401(2). But NetChoice didn't argue below that the provision's potential application to non-accountholders rendered it overinclusive—so the district court's resolution of the issue on those grounds warrants reversal. *See Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026). And the court's analysis is particularly improper in the context of a facial challenge, where "courts cannot conjure up their own hypotheticals en route to striking down laws as overbroad." *Fayetteville Pub. Libr.*, 2026 WL 2197765, at *6.

In any event, the district court's conclusion is wrong, which is likely why NetChoice never advanced this argument. For starters, it's unclear from the record whether any platforms actually send notifications to non-accountholders. To the contrary, notifications involve activity intrinsically associated with users' accounts, such as "reactions and comments to content" users have posted via their "own account," or updates involving other individuals or entities users have set their accounts to follow. *See, e.g.*, R. Doc. 52, at 22; App. 498; R. Doc. 57-9 at 31; *How notifications work on Instagram*, INSTAGRAM.[10] And it's entirely unclear whether platforms even *can* send notifications to non-accountholders, since notifications are usually (and perhaps exclusively) sent through users' accounts.

[10] https://perma.cc/4CVW-7PUN?type=image.

The upshot is that the Notifications Provision's technical application to non-accountholders may "burden" little to no speech at all—much less "substantially … more than necessary"—if platforms don't send notifications to non-accountholders in the first place. *FSC*, 606 U.S. at 471. And that's assuming the notifications are even protected speech to begin with. *But see supra* 20-22. The district court's tailoring analysis is thus wholly unsupported—further underscoring the court's error in excusing NetChoice's failure to develop the requisite record. *See, e.g., Bonta I*, 152 F.4th at 1020-21 (explaining that, to properly analyze a facial challenge, courts "need[] to know the facts that underlie th[e] tailoring determination—for every application").

Regardless, even if platforms send nighttime notifications to non-accountholders, the Notifications Provision still wouldn't be fatally overinclusive. To the contrary, if anything, Arkansas has an even stronger interest in ensuring platforms don't interrupt the sleep of children who don't have accounts. *See Brandt*, 147 F.4th at 890. After all, non-accountholders presumably don't have accounts either because they don't want one, or their parents don't want them to have one. And stopping only those platforms on which a child has an account from sending nighttime notifications would accomplish little if other platforms could bombard the child with notifications throughout the night. So far from making the Notifications

Provision overinclusive, regulating nighttime notifications to non-account holding children would be entirely "necessary to further [Arkansas'] interests." *FSC*, 606 U.S. at 471. At minimum, the provision doesn't burden "substantially more" speech than needed. *Id.*

*Second*, after wrongly holding the Notifications Provision impermissibly overinclusive, the district court deemed it underinclusive too. It reasoned that, because the provision requires platforms to "allow" children's "parent[s] or guardian to modify t[he] setting" preventing nighttime notifications, Ark. Code Ann. § 4-88-1402(d)(2)(A), the provision is "so underinclusive as to be functionally useless" in protecting children's wellbeing. App. 936; R. Doc. 69, at 16. But "the First Amendment imposes no freestanding underinclusiveness limitation," so States "need not address all aspects of a problem in one fell swoop." *TikTok*, 604 U.S. at 76. The Supreme Court has therefore "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015). So to the extent the Notifications Provision regulates speech, that it allows parents to determine whether nighttime notifications are appropriate for their children doesn't make it unconstitutional. *See Paxton*, 177 F.4th at 670 (holding likely constitutional law

requiring age verification and parental consent for children to download apps and make in-app purchases).[11]

To the contrary, Arkansas has "good reason" to afford parents discretion over nighttime notifications. *TikTok*, 604 U.S. at 76. After all, parents have the "right to direct the upbringing and education of their children," including the "right not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026) (per curiam). And parents are better equipped than the State to determine whether a child's particular needs or circumstances warrant an exception from the general no-nighttime-notifications rule. Those circumstances could include, for instance, an extracurricular or work schedule that keeps the child out later than usual, or a health condition that requires the child to keep a non-traditional schedule. *See, e.g.*, *A.J. T. ex rel. A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 351 (2025) (explaining that teenager's morning seizures required her to attend school in the evening and noting "a great many children with disabilities and their parents … face [such] daunting challenges on a daily basis" (quotation omitted)).

---

[11] The *Paxton* decision also confirms that the age-verification and parental-consent requirements at issue in consolidated case No. 25-1889 are constitutional. *See id.*

The Notification Provision's parental override option therefore advances, rather than undercuts, Arkansas's compelling interest in protecting children's overall "physical and psychological" wellbeing. *Brandt*, 147 F.4th at 890. That interest typically will be best served by restricting nighttime notifications, but there could be exceptions depending on children's individualized needs and vulnerabilities. And recognizing parents' "primary role … in the upbringing of their children," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), the provision entrusts parents with deciding when such an exception is appropriate.

In doing so, the provision also advances the State's important interests in empowering and "reinforc[ing] parental decisionmaking." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011) (Alito, J., concurring). Even more importantly, the provision will increase "parental awareness and involvement" in children's social-media activity, which "will inherently mitigate the dangers of the platforms" to children. *Yost*, 180 F.4th at 291. The district court was thus wrong to conclude that banning notifications with no exceptions would better advance Arkansas's interests. And in any event, the district court impermissibly "second-guess[ed]," *Fox*, 492 U.S. at 478, Arkansas's exercise of the significant "latitude" intermediate scrutiny affords it to decide which "regulatory path is best or most appropriate," *TikTok*, 604 U.S. at 77-78 (quotation omitted).

*Brown*, which the district court cited for support, doesn't alter that conclusion. For starters, the California law in *Brown* was a content-based restriction that barred children from purchasing "violent" video games, 564 U.S. at 802—not a mere content-neutral, time, place, and manner regulation (at most) like the Notifications Provision. Accordingly, *Brown* applied strict scrutiny because California's law "restrict[ed] the *ideas* to which children [were] exposed," 564 U.S. at 794 (emphasis added), but intermediate scrutiny and its far "more forgiving" tailoring standard applies here, *CCIA*, 2025 WL 3458571, at *4.

Moreover, the law in *Brown* didn't just allow parents to provide their children with violent video games. Instead, as the Court emphasized, certain adults, such as "an aunt or uncle" could sell them to children. *Brown*, 564 U.S. at 802. And there also wasn't a prohibition on persons simply giving children the games. Cal. Civ. Code Ann. § 1746.1(a). Here, by contrast, only the child's "parent or guardian" may change the nighttime notifications setting. Ark. Code Ann. § 4-88-1402(d)(2)(A). So, while allowing children to play violent video games if certain adults sold (or rented) them or if anyone simply loaned or gave children the games significantly undermined California's stated goal of protecting children from the allegedly intrinsically harmful games, there are "good reason[s]" why some parents may exempt their children from the no-nighttime-notifications rule that would not

undermine Arkansas's interests. *TikTok*, 604 U.S. at 76; *see supra* 29-30. What's more, the district court wrongly ignored that, regardless of parents' ultimate decision as to whether nighttime notifications are appropriate for their child, simply "involv[ing]" them in this process will make social media safer for children. *Yost*, 180 F.4th at 290 (distinguishing *Brown*).

The district court's suggestion that the parental override option would render the Notifications Provision "functionally useless" because "parents are part of the problem" is similarly misguided. App. 936; R. Doc. 69, at 16. Though not entirely clear, the district court's logic appears to be that, because parents could already protect their children's sleep by confiscating their phones at nighttime but many don't do so, parents will also allow nighttime notifications even when it isn't in their child's best interests. That reasoning is flawed. For starters, the district court's prediction as to parents' likely behavior is mere speculation and once again impermissibly substitutes the court's judgment for Arkansas's. *See TikTok*, 604 U.S. at 78. In any event, the district court wrongly assumed that parents are fully aware of the various notifications their children receive at night. *See, e.g.*, App. 332; R. Doc. 57-1, at 51 (Meta's documents explaining that "parents can't understand and don't know how to help" manage their children's social media use); App. 452; R. Doc. 57-8, at 41 (explaining that parents have sometimes "never even heard of" platforms

their child uses, and that children often "hid[e]" their use of platforms from their parents). And again, the district court wrongly overlooked that increasing "parental awareness and involvement" in children's social-media activity itself make platforms safer for children. *Yost*, 180 F.4th at 291.

Likewise, the district court ignored legitimate reasons why parents could permit children to keep their phones in their room at night, while also deciding they shouldn't receive social-media notifications. Those could include scenarios where a mother works the night shift and needs to be able to contact her child in case of an emergency, or when the child uses his device as an alarm clock. On the other hand, even if parents prohibited their children from having phones at night, children could circumvent that rule. *See* App. 452; R. Doc. 57-8, at 41 (explaining that children are "adept at evading" parents' existing means for supervising social-media use). For example, a child could retrieve his device after his parents go to bed. Or he could secretly obtain an additional device and hide it from his parents, such as by borrowing a friend's old device. The Notifications Provision ensures that, even under such circumstances, children are protected, and parental discretion isn't undermined.

Finally, even ignoring the many good reasons it affords parents discretion, the Notifications Provision would still withstand scrutiny. After all, if parents permit nighttime notifications for their child, then the Notification Provision's (supposed)

burden on platforms' speech will be eliminated. In other words, parents will either (1) leave the default setting in place—thus advancing the State's interest in protecting children's sleep; or (2) allow nighttime notifications—thereby removing First Amendment burdens. So in practice, the provision will either advance Arkansas's interest in protecting children's wellbeing, or not restrict speech, thus easily surviving intermediate scrutiny.

In sum, to the extent the Notifications Provision regulates protected activity at all, it's adequately tailored, and withstands intermediate scrutiny. NetChoice's facial challenge to the Notifications Provision thus fails several times over.

### B. The Privacy-and-Safety Provision doesn't violate the First Amendment.

NetChoice's facial challenge to the Privacy-and-Safety Provision also fails. That provision requires platforms to "[e]nsure that, by default," social-media platforms set the "[p]rivacy and safety settings" for Arkansas children to "the most protective level of control for privacy and safety offered by" the platform. Ark. Code Ann. § 4-88-1402(d)(2)(A). Despite recognizing Arkansas's important "interest in protecting minors from exploitation and abuse" and that "existing protections are insufficient and prophylactic measures are much needed," App. 939; R. Doc. 69, at 19, the district court held the Privacy-and-Safety Provision facially unconstitutional.

It once again failed to perform the requisite analysis, and wrongly concluded the provision is insufficiently tailored.

### *1. NetChoice failed to develop the record to determine which applications implicate protected activity, and the district court's unsubstantiated assumption that every application does requires reversal.*

As with the Notifications Provision, NetChoice did not carry its "burden to establish t[he] factual record so that the district court could have properly considered every conceivable application" of the Privacy-and-Safety Provision to every potentially covered entity. *Bonta II*, 170 F.4th at 758. Its failure to do so independently compels reversal. *Fayetteville Pub. Libr.*, 2026 WL 2197765, at *7. Indeed, a complete record is especially necessary here given that, rather than establishing any specific requirement across platforms, the Privacy-and-Safety Provision requires each platform to set children's accounts to the most secure setting that platform already offers. So the provision's impact could differ dramatically across platforms.

For example, some platforms offer privacy-and-safety settings that limit "who can see an account holder's posts" or whose "posts an account holder can see." App. 937; R. Doc. 69 at 17. Meanwhile, "some platforms allow people to protect their privacy from the platform itself, limiting the platform's collection or use of their data." App. 937-38; R. Doc. 69 at 17-18. And other platforms may offer settings that protect users in countless other ways, such as by allowing accountholders to block

private messages from strangers, or by hiding personal information from strangers (like birthdays or contact information), or even the accountholder's location. *See, e.g.*, *Best Practices-Social Media*, HARVARD UNIVERSITY.[12]

Given the wide and potentially limitless variety of privacy-and-safety settings across all platforms, "[t]he First Amendment analysis [will be] fact intensive and will surely vary from platform to platform." *Bonta II*, 170 F.4th at 758. What's more, many platforms may offer only one setting in the first place (with no higher privacy-and-safety setting available), meaning the Privacy-and-Safety Provision ultimately won't require them to do anything at all, so the provision's application to them would necessarily be constitutional.

Nevertheless, the district court excused NetChoice's failure to develop the necessary record and purported to perform the facial analysis anyway. Despite acknowledging that privacy-and-safety settings "may vary in their scope and effect" across platforms, App. 938; R. Doc. 69, at 18, the district court did not "carefully parse" how every covered entity's highest privacy-and-safety setting (or lack thereof) "*actually functions*." *Moody,* 603 U.S. at 749 (Jackson, J., concurring). Instead, "bypassing the required inquiry entirely," *Fayetteville Pub. Libr.*, 2026 WL 2197765, at *6, the court relied on two sweeping (and unsubstantiated)

---

[12] https://privsec.harvard.edu/best-practices-social-media.

generalizations about *all* privacy-and-safety settings. It summarily concluded that, despite their variety, (1) "all" heightened privacy-and-safety settings "restrict platforms' ability to disseminate minors' speech and to disseminate speech to minors;" and (2) every application of the Privacy-and-Safety Provision "therefore implicate[s] the First Amendment." App. 938; R. Doc. 69, at 18. This was error. *See Moody*, 603 U.S. at 789 (Alito, J., concurring) (explaining that "such generalities are insufficient").

First, nothing in the record supports the district court's assumption that every single platform's highest privacy-and-safety setting limits the platform's dissemination of content. Second, even accepting that first conclusion, it doesn't follow that every application of the Privacy-and-Safety Provision implicates the First Amendment. That's because many platforms' methods of disseminating content are not expressive at all—including when platforms simply push each user whatever an algorithm believes he wants. *See Bonta I*, 152 F.4th at 1021 ("some personalized recommendation algorithms may be expressive, while others are not, and that inquiry is fact intensive").[13] Likewise, if some heightened privacy-and-safety settings limit

[13] To the extent the district court's analysis also relied on users' right to receive information, NetChoice lacks third-party standing to litigate on their behalf. *See supra* 15-18. Regardless, that right is "entirely derivative of the rights of [an actual] speaker," so unless a platform's output reflects expressive activity, users have no

strangers' ability to approach children via private communications, that wouldn't implicate the platforms' First Amendment rights either. *See Moody*, 603 U.S. at 725 (majority) (merely "transmitting direct messages" likely doesn't "create[] an expressive product"). Moreover, even the district court itself previously (and correctly) concluded that platforms' data collection practices "are non-expressive conduct," *NetChoice v. Griffin*, 812 F. Supp. 3d 905, 920 (W.D. Ark. 2025)—rendering its conclusion that the Privacy-and-Safety Provision would implicate protected activity insofar as it limits platforms' data collection particularly inexplicable, App. 937-38; R. Doc. 69, at 17-18.

In short, the district court failed to account for the "online world['s]" "varie[ty] and "complex[ity]" and relied on unsubstantiated generalities about privacy-and-safety settings and their (supposed) impact on expressive activity. *Moody,* 603 U.S. at 725. Those errors require reversal.

### *2. To the extent the Privacy-and-Safety Provision regulates speech, it's content-neutral, and withstands intermediate scrutiny.*

Even if the district court were correct that every application of the Privacy-and-Safety Provision regulates speech, NetChoice's facial challenge would still fail. After all, Arkansas has an important "interest in protecting minors from exploitation

---

constitutional right to receive it. *Penn. Fam. Inst., Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007) (quotation omitted).

and abuse," and "existing protections are insufficient and prophylactic measures are much needed." App. 939; R. Doc. 69, at 19. The Privacy-and-Safety Provision is a content-neutral law that provides children this "much needed" online protection. *Id.* Any applications that may implicate speech survive intermediate scrutiny. *See TikTok*, 604 U.S. at 70.

Two circuits recently concluded as much with respect to similar state laws that are *more* restrictive than Arkansas's. The Ninth Circuit recently concluded a California law that required platforms to set children's accounts to a statutorily specified "private mode" likely would survive intermediate scrutiny, even though under the "private mode" setting "only users connected to a minor's account (being 'friends,' for example) c[ould] view or interact with that minor's posts." *Bonta I*, 152 F.4th at 1017. Act 900, in contrast, only requires platforms to set accounts to the highest privacy-and-safety setting that each platform already offers, which could be less restrictive. Ark. Code Ann. § 4-88-1402. Similarly, an Eleventh Circuit stay panel recently concluded that a more restrictive Florida law is likely constitutional. That law prohibits young children from creating accounts on platforms that employ addictive features—thereby entirely preventing platforms from disseminating content to and from such children. *CCIA*, 2025 WL 3458571, at *1. Because these more

restrictive laws survived intermediate scrutiny, it follows that the Privacy-and-Safety provision does too. Indeed, it could even withstand strict scrutiny.

The district court nevertheless concluded that the Privacy-and-Safety Provision failed intermediate scrutiny, reasoning it was both overinclusive and underinclusive. It's wrong on both counts.

*First*, the district court wrongly concluded that the Privacy-and-Safety Provision is impermissibly overinclusive insofar as it applies to websites like Nextdoor and Pinterest, which the district court believed were "unlikely to be the site of sexual exploitation." App. 939; R. Doc. 69, at 19. The district court didn't explain its reasoning regarding Pinterest. *See id.* However, at least with respect to Nextdoor, its conclusion was based on Nextdoor's (alleged) lower percentage of minor users and prohibition of anonymous accounts. App. 927; R. Doc. 69, at 7. According to the district court, the Privacy-and-Safety Provision is therefore fatally overinclusive. That's wrong for multiple reasons.

To start, the district court's suggestion that Nextdoor and Pinterest are not used by predators to exploit children is simply incorrect. There are numerous reported instances of predators using these platforms to approach children. For example, in one instance, a 47-year-old man used Nextdoor to solicit sex from a 13-year-old boy who had posted that he was looking for neighborhood jobs such as

"lawn care" and "dog walking." *Lake Forest Man Faces Sex Charge After Connecting with Teen on Nextdoor App, Court Papers State*, KIRO 7 NEWS (June 26, 2020).[14] Likewise, predators have "inundated" children's Pinterest accounts with sexually suggestive messages and posed as teenagers to "groom" children on the platform. Jesselyn Cook, *Men on Pinterest are creating sex-themed image boards of little girls. The platform makes it easy.*, NBC NEWS (Mar. 9, 2023); [15] *see, e.g.*, Ashley Knight, *Baldwin Co Mom Warns of Predators on Pinterest After Catching Daughter Talking to Stranger*, NBC 15 NEWS (Dec. 21, 2022).[16] Indeed, two U.S. Senators recently expressed their concerns regarding "pedophiles[']" use of "Pinterest to entice and target" children. *See* Marsha Blackburn and Richard Blumenthal, *Letter to Bill Ready* (Mar. 14, 2023).[17] So contrary to the district court's conclusion, platforms like Nextdoor and Pinterest pose dangers to children—further

---

[14] https://www.kiro7.com/news/local/lake-forest-man-faces-sex-charge-after-connecting-with-teen-nextdoor-app-court-papers-state/RGGW65HOHRBUPI6P4FFBGJAVZI/.

[15] https://www.nbcnews.com/tech/internet/pinterest-algorithm-young-girls-videos-grown-men-investigation-rcna72469.

[16] https://mynbc15.com/news/local/mother-warns-of-predators-on-pinterest-after-catching-daughter-talking-with-a-stranger.

[17] https://www.blackburn.senate.gov/services/files/1C2A5112-CCC9-4EA9-B431-54FE8E7383E8.

illustrating the court's error in attempting a facial analysis without the required record. *See Bonta I*, 152 F.4th at 1020-21.

In any event, even assuming children face a lower risk of exploitation on Nextdoor and Pinterest, the Privacy-and-Safety Provision's extension to those two sites doesn't make it unconstitutional. After all, laws pass intermediate scrutiny as long as they don't "burden substantially more speech than necessary to further [the State's] interests." *FSC*, 606 U.S. at 471. That means "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *TikTok*, 604 U.S. at 76. Likewise, a law's constitutionality "depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case.'" *W. Virginia v. B. P. J.,* 146 S. Ct. 2356, 2376 (2026) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989)). Under these "forgiving" standards, *CCIA*, 2025 WL 3458571, at *4, the Privacy-and-Safety Provision's application to Nextdoor and Pinterest doesn't make the provision unconstitutional. To the contrary, the provision efficiently addresses the "overall problem" of online child exploitation by uniformly requiring platforms to use the highest safety settings they offer for any children that have accounts on the site. *B. P. J.*, 146 S. Ct. at 2376.

Moreover, to the extent certain platforms have few child users and are less frequently sites of exploitation, the provision will place hardly any "burden" on their dissemination of content at all. *FSC*, 606 U.S. at 471. Indeed, given that the district court's theory is that the Privacy-and-Safety Provision implicates the First Amendment by limiting dissemination of content to and from minors, it's unclear how the provision could burden "substantially more" speech than necessary by applying to platforms not frequented by children. *FSC*, 606 U.S. at 471. After all, if there are few children users, such platforms will already disseminate little to no content to or from children.[18]

Similarly, the district court's conclusion was also wrong insofar as it relied on children's (supposed) rights "to speak and be spoken to on those platforms" they don't frequent in the first place. App. 939; R. Doc. 69, at 19. Any burden placed on children's rights by heightened privacy-and-safety settings on sites minors rarely use will be both minimal (by definition) and justified by the "overall problem" of online exploitation and the State's interest in preventing it. *B. P. J.*, 2026 WL 1868739, at *12. And regardless, NetChoice lacks third-party standing. *See supra* 15-18.

---

[18] Likewise, it's unclear from the record whether all such platforms offer higher privacy-and-safety settings. If they don't, then the provision wouldn't require them to do anything, *see supra* 36—another reason why the provision isn't overinclusive.

In sum, the Privacy-and-Safety Provision doesn't burden any more speech than "necessary" to advance Arkansas's important interests—much less "substantially more." *FSC*, 606 U.S. at 471. At minimum, the district court lacked the necessary record to properly consider whether the Privacy-and-Safety Provision burdens more speech than justified. *See Bonta I*, 152 F.4th at 1020-21.[19]

*Second*, the district court wrongly deemed the Privacy-and-Safety Provision underinclusive. It did so by reading the provision to permit children to simply change the privacy-and-safety setting themselves, supposedly defeating Arkansas's goal of protecting children from exploitation. App. 938-40; R. Doc. 69, at 18-20. But NetChoice never raised this argument in its briefing below. Instead, NetChoice's briefs interpreted the provision as allowing only *parents* to change the setting, but NetChoice then shifted gears and raised this new interpretation for the first time at the preliminary-injunction hearing. Tr. 48:20-49:11. And even then, NetChoice

[19] In passing, as with the Notifications Provision, the district court expressed concerns about the Privacy-and-Safety Provision's technical application to non-accountholders (in addition to accountholders). App. 937; R. Doc. 69, at 17 n.11. Strangely, the court claimed *Defendants* pressed this application based on their brief's explanation that parents often can't prevent children from creating or accessing their "social-media *accounts*." *Id.* (quoting R. Doc. 56, at 41 n.11) (emphasis added). Regardless, as NetChoice itself explained below, "privacy settings are generally reserved for account holders," R. Doc. 52, at 47—and it's unclear whether most platforms even can offer such settings to non-accountholders. So as with the Notifications Provision, the district court's concerns are baseless. *See supra* 25-28.

didn't fully press the point, instead simply suggesting that the provision was "a little unclear" as to whether children could change the settings on their own, and that it "seem[ed]" like parental authorization may not be required. *Id.*

By adopting this late-breaking, half-baked argument, the district court arguably contravened party-presentation principles once again. *See Margolin*, 146 S. Ct. at 1288. After all, Defendants had no "chance to address" this point in their briefing, *id.*, and no "meaningful opportunity to respond" at the hearing either given they had no prior notice of NetChoice's new interpretation. *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1181 (D.C. Cir. 2011). To prevent such unfairness—and to preserve our "adversarial system of justice," *Margolin*, 146 S. Ct. at 1288—arguments "raised for the first time at oral argument and not briefed" are typically forfeited. *Gebresadik v. Gonzales*, 491 F.3d 846, 851 n.6 (8th Cir. 2007).

In any event, the district court's interpretation of the Privacy-and-Safety Provision is wrong. As the court itself explained, the provision "says nothing about who can change the settings." App. 938; R. Doc. 69, at 18. Nevertheless, the court read into the provision an option for children to change the setting themselves that appears nowhere in the text. *See id.* To be sure, the Privacy-and-Safety Provision indicates that children's accounts must have the highest privacy-and-safety setting "by default." Ark. Code Ann. § 4-88-1402. But while the word "default" may

sometimes indicate that other options may be selected, the district court identified no hard-and-fast rule that it always indicates as much. Rather, "default" can mean "a selection made … automatically or without active consideration due to [the] *lack* of a viable alternative." *Default*, MERRIAM-WEBSTER.COM (emphasis added);[20] *see, e.g.*, *Default*, DICTIONARY.CAMBRIDGE.ORG (defining "default" as a "standard setting esp[ecially] of computer software," without suggesting that a user may select a different setting).[21] And there are many, ready examples from the online world—including from NetChoice's own members regarding their already-existing safety settings for children—where "default" settings "can't be changed." *How Discord Is Building Safer Experiences for Teens*, DISCORD (Feb. 9, 2026);[22] *The Teen Experience on Snapchat*, SNAPCHAT ("strict default settings for teens … cannot be turned off").[23]

Moreover, statutes must be read in context. *See, e.g.*, *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). "[C]ontext … includes common sense." *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring). It also "always

---

[20] https://www.merriam-webster.com/dictionary/default.

[21] https://dictionary.cambridge.org/us/dictionary/english/default.

[22] https://perma.cc/BKD8-TQE8.

[23] https://perma.cc/8BKK-LANP.

includes [the statute's] evident purpose," and "evident purpose," in turn, "always includes effectiveness." A. Scalia & B. Garner, Reading Law 63 (2012); *see Rogers v. Rogers*, 97 S.W.3d 429, 440 (Ark. App. 2003). And given that the Privacy-and-Safety Provision would accomplish little if children could just change to a lower privacy-and-safety setting themselves, context strongly suggests that the provision doesn't permit children to choose a different setting. Any lingering doubt is resolved by the constitutional-avoidance canon. Under that canon of construction, "[i]f it is possible to construe a statute as constitutional," courts "must do so." *Bowker v. State*, 214 S.W.3d 243, 249 (Ark. 2005). And even assuming Defendants' reading of the provision is "not the best one," it's "at least fairly possible." *Hansen*, 599 U.S. at 781 (quotation omitted).

Finally, even if the provision *did* permit children to change the setting themselves, the district court's conclusion that it would be unconstitutional doesn't follow. After all, if the child changed the privacy-and-safety setting, then the platform would no longer be limited in disseminating content to and from the child—entirely obviating any First Amendment concerns. If, on the other hand, the child kept the heightened privacy-and-safety setting in place, that would advance Arkansas's important interests. *See Brandt*, 147 F.4th at 890. So either way, the provision would be constitutional.

In sum, NetChoice's facial challenge to the Privacy-and-Safety Provision fails for many reasons.

### C. The Addictive-Practices Provision isn't impermissibly vague.

Tacitly acknowledging that the Addictive-Practices Provision would withstand First Amendment scrutiny (to the extent it even implicates speech), the district court erroneously concluded that the provision is void for vagueness. The Addictive-Practices Provision requires platforms to "ensure that" they don't "engage in practices to evoke any addiction or compulsive behaviors in" Arkansas children. Ark. Code. Ann. § 4-88-1402(d)(1). The district court concluded that the provision is impermissibly vague by first ignoring that it imposes liability only when platforms act with the specific purpose of addicting children, and then by reading the provision to include off-platform addictions—wrongly concluding that that breadth would make the provision unconstitutional.

#### *1. The Addictive-Practices Provision isn't standardless.*

The Addictive-Practices Provision isn't impermissibly vague. A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). But "[t]he Constitution does not require meticulous specificity." *Iowa Safe*

*Schs. v. Reynolds*, 172 F.4th 589, 597 (8th Cir. 2026). Indeed, "perfect clarity and precise guidance" are not "required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 791. Moreover, *mens rea* requirements "reduce[] any potential for vagueness." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010). In short, a statute is only void for vagueness "if it fails to give fair warning that certain conduct is prohibited." *Langford v. City of St. Louis*, 3 F.4th 1054, 1059 (8th Cir. 2021).

The Addictive-Practices Provision provides more than sufficient "warning." *Id.* Its prohibition is clear: Social-media platforms may not engage in practices with the specific goal of causing minors to become addicted to their platforms, or to otherwise use their platforms compulsively. *See* Ark. Code Ann. § 4-88-1402(d)(1). Liability can only attach if a platform "engages in practices *to* evoke any addiction or compulsive behaviors," *id.* (emphasis added)—not just if a practice happens to cause that result regardless of the platform's intent. That's because, when paired with a verb like "evoke" and used in this manner, Ark. Code Ann. § 4-88-1402(d)(1), "to" "denotes purpose," *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 668-69 (2008). It operates as "a function word to indicate purpose, intention, tendency, result, or end," thus "suggest[ing] purposeful action." *United States v. Soza*, 874 F.3d 884, 892-93 & n.34 (5th Cir. 2017) (quoting *To,* Merriam-Webster Collegiate

Dictionary (11th ed. 2003)). Therefore, "to" combined with a verb "is equivalent to 'in order to' plus the infinitive or 'for the purpose of' plus the gerund form of the infinitive." *United States v. O'Hara*, 143 F. Supp. 2d 1039, 1041-42 (E.D. Wis. 2001).

So the Addictive-Practices provision prohibits platforms from engaging in practices in order to, or for the purpose of, evoking addiction or other compulsive behaviors in minor users. *See Allison Engine*, 553 U.S. at 668-69 (holding that statute prohibiting false statements made "to get a false or fraudulent claim paid or approved" imposed liability only where the statement was made with "the purpose of" getting the claim paid or approved); *Soza*, 874 F.3d at 893-94 (similar). And this purposeful or intentional *mens rea* requirement ameliorates any possible vagueness concerns. *Holder*, 561 U.S. at 21.

### *2. The Addictive-Practices Provision's specific mens rea requirement controls over the generic strict-liability provision.*

Nevertheless, at NetChoice's urging, the district court "eliminated t[he] element of intent" from the Addictive-Practices Provision, *Allison Engine*, 553 U.S. at 669, instead interpreting the provision to lack any *mens rea* requirement at all. And the court concluded that, with no *mens rea*, the provision is impermissibly vague. App. 934; R. Doc. 69, at 14. In doing so, the court relied on Ark. Code Ann. § 4-88-1403(b)(2)(C)'s indication that violations of the subchapter of Arkansas statutes where the Addictive-Practices Provision is codified are generally "strict liability civil

offense[s].” According to the district court, this meant that platforms may be held liable under the Addictive-Practices Provision for any conduct that causes a child to become addicted—regardless of the platform’s knowledge, purpose, or intent. App. 934-35; R. Doc. 69 at 14-15. The court therefore believed that the provision improperly subjected platforms to liability based “entirely” on the (supposedly) unpredictable “sensitivities” of minors, and thus “fails to specify a standard of conduct to which platforms must conform.” App. 933; R. Doc. 69, at 13 (quotations omitted).

But the district court’s analysis entirely ignored Defendants’ argument that the provision’s use of “to” “denotes purpose.” *Allison Engine*, 553 U.S. at 668-69. And “[i]t is a commonplace of a statutory construction that the specific governs the general.” *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Thus, “specific statutory language should control more general language where there is a conflict between the two.” *Nat’l Cable & Tele. Ass’n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002); *see Searcy Farm Supply, LLC v. Merchants & Planters Bank*, 256 S.W.3d 496, 501 (Ark. 2007). So the Addictive-Practices Provisions’ indication that platforms are only liable under it, specifically, if they act “for the purpose of” addicting children trumps § 4-88-1403(b)(2)(C)’s generic strict-liability rule. *O’Hara*, 143 F. Supp. 2d at 1041-42.

Section 1403(b)(2)(C)'s status as a general provision subject to displacement by specific *mens rea* requirements is reinforced by § 4-88-1403(a)(1), which indicates that platforms may be held liable if they "knowingly" violate Arkansas's age-verification requirements. Under bedrock principles of statutory interpretation, this "knowingly" requirement supersedes the strict-liability provision—and the Addictive-Practice Provision's *mens rea* requirement does too. *RadLAX*, 566 U.S. at 645. Any other interpretation improperly nullifies the plain language of the Addictive-Practices Provision and § 4-88-1403(a)(1).

In contrast, Defendants' reading doesn't render Ark. Code Ann. § 4-88-1403(b)(2)(C) inoperative. Its strict-liability rule still applies to the various other prohibitions codified in the relevant subchapter that lack a specific *mens rea*—including other Act 900 provisions at issue here. *See* Ark. Code Ann. §§ 4-88-1402(d)(2)(A)-(B). Defendants' reading therefore "harmoni[zes] and "give[s] effect" to each word and provision of the statutory text, whereas the district court's interpretation doesn't. *Keep Our Dollars in Indep. Cnty. v. Mitchell*, 518 S.W.3d 64, 68 (Ark. 2017).

Comparing the Addictive-Practices Provision to other provisions at issue in this consolidated appeal further confirms the *mens rea* requirement. *See State v. Colvin*, 427 S.W.3d 635, 640 (Ark. 2013). Take Ark. Code Ann. § 4-88-1502(a)(4),

which forbids platforms from "us[ing] a design, algorithm, or feature *that* ... causes a user to ... [d]evelop or sustain an addiction to the social media platform." (emphasis added). This prohibition on features "that cause" addiction contrasts with the Addictive-Practices Provision's bar on platforms engaging in practices "to evoke" addiction. If the Addictive-Practices Provision, like § 4-88-1502(a)(4), used the word "that" instead of "to"—thereby forbidding practices "that evoke" addiction—then the provision would contain no *mens rea* requirement.

But the Addictive-Practices Provision uses "to," not "that." That distinction matters. Indeed, while the district court's reading conflates the meaning of "*that* cause" and "*to* evoke," the legislatures' "use of both phrases indicates that they are not considered to be synonymous." *Thornbrough v. Gage*, 350 S.W.2d 306, 309 (Ark. 1961). To the contrary, this "material variation in terms suggests a variation in meaning." Scalia & Garner 170. It thus confirms that "to evoke" should be read to "denote[] purpose." *Allison Engine*, 553 U.S. at 668-69. That's the only reading that gives full "meaning and effect ... to every word" the legislature enacted. *First Arkansas Bail Bonds v. Arkansas*, 284 S.W.3d 525, 527 (Ark. 2008).

Regardless, even if Defendants' reading of the Addictive-Practices Provision were "not the best one," it's "at least fairly possible." *Hansen*, 599 U.S. at 781. The

constitutional-avoidance canon therefore requires adopting it. *Id.*; *Bowker*, 214 S.W.3d at 249.

Finally, even if the Addictive-Practices Provision lacked a *mens rea* when enforced civilly, criminal violations must be "knowing[ ] and willful[ ]." Ark. Code Ann. §§ 4-88-103; 4-88-1403(b)(1). So the district court's *mens rea* concerns don't apply to criminal enforcement, and the court at least erred in extending the injunction to Arkansas's prosecutors.

### *3. The Addictive-Practices Provision applies only to social-media addictions and isn't unconstitutional regardless.*

In deeming the Addictive-Practices Provision void for vagueness, the district court also accepted NetChoice's argument that the provision covers addictions to "off-platform activities." App. 934; R. Doc. 69, at 14. Because the Addictive-Practices Provision bars platforms from "engaging in practices to evoke any addiction or compulsive behaviors," Ark. Code Ann. § 4-88-1402(d)(1), and doesn't include a provision expressly limiting its application to addictive or otherwise compulsive use of social media itself, the district court reasoned that a platform could potentially be held liable if, for example, it causes children to become addicted to alcohol or gambling. According to the district court, such potential applications to off-platform addictions make the Addictive-Practices Provision void for vagueness. The district court's starting premise is wrong, and regardless, its conclusion doesn't follow.

Even if NetChoice were right that the Addictive-Practices Provision applies to off-platform addictions, the provision still wouldn't be unconstitutionally vague. To be sure, such a construction would expand the Addictive-Practices Provision's scope. "But just because [a] law is broad does not mean that it is ambiguous, much less unconstitutionally vague." *Calzone v. Summers*, 942 F.3d 415, 426 (8th Cir. 2019) (en banc). Rather, the question is still whether the statute—whatever its breadth—"provides fair warning" as to what is prohibited. *Langford*, 3 F.4th at 1059. The Addictive-Practices Provision does. If the provision reaches off-platform additions as NetChoice contends, social media companies must not engage in any practices for the purpose of addicting children—whether to social media itself, or something else. So platforms can avoid liability by not engaging in practices with the goal of addicting children to alcohol or tobacco, for example. There's nothing impermissibly vague about that; platforms would just need to not take intentional steps to make children addicts. While broad, that mandate is clear, and "breadth alone does not render a statute unconstitutional." *United States v. Beeler*, 168 F.4th 1111, 1115 (8th Cir. 2026).

In any event, both context and commonsense counsel against reading the Addictive-Practices Provision to apply to off-platform addictions. Read in a vacuum, "any addiction or compulsive behaviors" could encompass off-platform activities,

Ark. Code Ann. § 4-88-1402(d)(1), but that's not how to interpret statutes: "[c]ontext always matters." *King v. Burwell*, 576 U.S. 473, 500-01 (2015) (Scalia, J., dissenting). "It is axiomatic that the meaning of certain words or phrases cannot be determined in isolation, but must be drawn from the context in which they are used." *Bush v. State*, 2 S.W.3d 761, 763 (Ark. 1999). Moreover, "[a] phrase gathers meaning from the words around it," *United States v. Behrens*, 713 F.3d 926, 929 (8th Cir. 2013), and "general language [must] be constructed to be comparable to the specific language of its context," *McKinney v. Robbins*, 892 S.W.2d 502, 504 (Ark. 1995) (quotation omitted). Thus, by interpreting language based on its context and "the company it keeps," courts "avoid giving unintended breadth" to statutory provisions. *Thigulla v. Jaddou*, 94 F.4th 770, 775 (8th Cir. 2024).

Applying those principles here, the Addictive-Practices Provision is properly read as only addressing efforts to addict children to social media, specifically. That's because "every other clause" of § 1402 "has to do with" social media itself, not other potentially addictive activities. *McKinney*, 892 S.W.2d at 504. Section 1402's Age-Verification, Notification, Privacy-and-Safety, and Dashboard Provisions all deal exclusively with online and on-platform conduct. *See* Ark. Code Ann. §§ 4-88-1402(a)-(c), (d)(2), (d)(4). Context therefore indicates that the Addictive-Practices Provision is similarly confined to social-media addictions—not addictions to alcohol or

gambling. *See, e.g.*, *McDonald v. Bowen*, 468 S.W.2d 765, 769 (Ark. 1971) (rejecting broad interpretation of provision allowing tax proceeds to be spent for "other public purposes," because "every other clause" related to "the attraction of new industry," specifically); *McKinney*, 892 S.W.2d at 503-04 (determining, based on context, that "domesticated animals" referred only to livestock, notwithstanding it "typically can include" pets).

Any remaining doubt is once again resolved by the constitutional-avoidance canon. Defendants' reading is "at least fairly possible." *Hansen*, 599 U.S. at 781. So if NetChoice's and the district court's interpretation would render the provision unconstitutionally vague, *but see supra* 55, Defendants' reading "must" be accepted instead, *Bowker*, 214 S.W.3d at 249.

The district court therefore erred by concluding the Addictive-Practices Provision is unconstitutionally vague.

### D. The Audit Provision isn't unconstitutionally vague.

The district court also erred by summarily concluding the Audit Provision is impermissibly vague. *See* App. 935; R. Doc. 69, at 15. That provision requires platforms to "conduct an audit at least [once] per quarter to ensure that the social-media platform's software, application, or other products are not causing minors to engage in compulsory or addiction-driven behavior." Ark. Code Ann. § 4-88-1402(d)(3). In

other words, social media companies must conduct audits to make sure their platforms aren't addicting children. This mandate is sufficiently clear, as platforms who don't conduct such audits have "fair warning" that they may be held liable. *Langford*, 3 F.4th at 1059. Although the Audit Provision is broader than the Addictive-Practices Provision insofar as it requires platforms to consider whether children are becoming addicted even if the platforms aren't trying to addict them, *see supra* 48-54, mere breadth doesn't make laws impermissibly vague. *Calzone*, 942 F.3d at 426. Accordingly, the Audit Provision is constitutional.

In reaching a contrary conclusion, the district court mistakenly believed that the Audit Provision reaches off-platform addictions. App. 935; R. Doc. 69, at 15. But the statutory context forecloses that conclusion. *See supra* 55-57. And even if the provision did extend to off-platform addictions, that added breadth doesn't make it unconstitutional. *See supra* 55. Nor does the strict-liability provision render the audit requirement impermissibly vague when it's enforced civilly. *See supra* 54. Platforms will know whether they are conducting audits—and, consequently, whether they are complying with the provision.

The district court's unexplained conclusion that the Audit Provision's reference to "addiction-driven behavior" makes the provision more expansive is both wrong and irrelevant. App. 935; R. Doc. 69, at 15. To be sure, the Audit Provision

requires platforms to audit for "addiction-driven behavior" rather than "addiction," Ark. Code Ann. § 4-88-1402(d)(3), but that doesn't make the provision broader, much less unconstitutional. That language clarifies that platforms need only consider users' on-platform "behavior" as part of their audit, without exploring any off-platform indicia of social-media addiction, or somehow probing children's actual psychological state. Ark. Code Ann. § 4-88-1402(d)(3). So if anything, this narrows the provision rather than broadening it. And regardless, "breadth alone" doesn't determine constitutionality. *Beeler*, 168 F.4th at 1115.

* * *

NetChoice has thus failed to prove the Audit Provision is likely unconstitutional, just like it has failed to prove the other challenged provisions are likely unconstitutional. Indeed, NetChoice hasn't carried its daunting burden to show that the challenged provisions' "realistic, not fanciful," unconstitutional applications (if any) "substantially" outweigh their lawful ones. *Hansen*, 599 U.S. at 770.

## IV. NetChoice Hasn't Carried Its Burden on the Remaining Preliminary-Injunction Factors.

Beyond failing to satisfy the likelihood-of-success-on-the-merits factor, NetChoice has also not made a "clear showing" of the other preliminary-injunction factors. *Mazurek*, 520 U.S. at 972.

Because NetChoice hasn't shown likely success, it hasn't shown its members will suffer any harm to their First Amendment rights absent an injunction. *See Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015). And to the extent that the district court's analysis relied on platforms' users' rights, NetChoice also hasn't shown (and the district court didn't find) that users will suffer irreparable harm. App. 943; R. Doc. 69, at 23.

NetChoice also hasn't established that the "merge[d]" balance-of-equities and public-interest factors favor a preliminary injunction. *Eggers*, 48 F.4th at 564-65. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people" the State "suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). Moreover, if Defendants are enjoined from enforcing Act 900, Arkansas children will remain unprotected from purposeful efforts to addict them to social media, *see supra* 48-50, and from other exploitation by both platforms and third-parties, *see supra* 3-7; *Brandt*, 147 F.4th at 890. And parents' ability to direct their children's upbringing will continue to be undermined. *See Mirabelli,* 607 U.S. at 497. The balance-of-equities and public-interest factors therefore weigh against a preliminary injunction.

## V. Any Preliminary Injunction Must Be Tailored.

Even if the "extraordinary and drastic remedy" of a preliminary injunction, *Mazurek*, 520 U.S. at 972, were warranted based on a "nearly impossible" to prove facial challenge, *Bonta I*, 152 F.4th at 1020, any injunction must be narrowly tailored. It should apply to only those provisions NetChoice has shown are likely unconstitutional, and only insofar as NetChoice satisfies the other preliminary-injunction factors with respect to each. That's because injunctions "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and "must be tailored to remedy specific harm shown," *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).

Moreover, under Arkansas law, the challenged provisions, like most current statutory provisions, are presumptively "severable," and "the invalidity of any provision" doesn't "affect other provisions ... which can be given effect" without the provision held to be unlawful. Ark. Code Ann. § 1-2-205. *See id.* § 1-2-117. And Act 900 itself contains a severability provision. *See* App. 281; R. Doc. 56-1, at 10. The various provisions at issue here are severable. Each provision will "still serve [its] purpose" even if its neighbors cannot be enforced, and the various provisions aren't "interrelated and dependent" on each other. *Jackson v. Norris*, 426 S.W.3d 906, 910 (Ark. 2013). For instance, the Addictive-Practices Provision doesn't depend on the

Default Provisions for its operation, *id.*, and can "can be given effect" even if the Default Provisions can't be enforced, and *vice versa*, Ark. Code Ann. § 1-2-205.[24] Similarly, the Addictive-Practices Provision's criminal enforcement doesn't depend on its civil enforcement. *See supra* 54. This further confirms that any injunction must be limited to only the provisions (and Defendants) on which NetChoice carried its burden.

## Conclusion

This Court should reverse and vacate the district court's order or, alternatively, narrow the injunction's scope.

[24] Likewise, Act 900 "c[ould] [still] be given effect" if any of the other provisions at issue in this consolidated appeal are deemed unenforceable, just as those provisions are severable from each other. Ark. Code Ann. § 1-2-205; *id.* § 1-2-117.

Respectfully submitted,

TIM GRIFFIN
Arkansas Attorney General

AUTUMN HAMIT PATTERSON
Solicitor General

JOSEPH NELSON
Senior Assistant Solicitor General

M. ERICA CROUSE
Assistant Solicitor General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-2007
autumn.patterson@arkansasag.gov
joseph.nelson@arkansasag.gov
erica.crouse@arkansasag.gov

*Counsel for Defendants-Appellants*

## Certificate of Compliance

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,969 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Equity A, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found in the file.

*/s/ Joseph Nelson*
Joseph Nelson

## Certificate of Service

I certify that on August 6, 2026 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/ Joseph Nelson*
Joseph Nelson